COYOTE VALLEY BAND OF POMO IN-
DIANS, Hopland Band of Pomo Indi-
ans, Karuk Tribe of California, and
Wanda Carrillo, Plaintiffs,

v.

UNITED STATES of America: William
Clark, as Secretary of the Interior; Pa-
tricia Simmons, as Tribal Operations
Officer, Bureau of Indian Affairs,
Washington, D.C. Office; Maurice Bab-
by, Area Director, Bureau of Indian
Affairs, Sacramento Area Office; Dan-
iel H. Swaney, Superintendent, North-
ern California Agency, Bureau of Indi-
an Affairs and Ronald Jaeger, Superin-
tendent, Central California Agency, Bu-
reau of Indian Affairs, Defendants.

Civ. No. S–84–482 MLS.

United States District Court,
E.D. California.

April 2, 1986.

Lester J. Marston, California Indian Le-
gal Services, Ukiah, Cal., Henry J. Sockbe-
son, Native American Rights Fund, Wash-
ington, D.C., for plaintiffs.

Louis Demas, Asst. U.S. Atty., Sacra-
mento, Cal., Pamela S. West, U.S. Dept. of
Justice, Washington, D.C., for defendants.

MEMORANDUM AND ORDER

MILTON L. SCHWARTZ, District Judge.

The court heard the parties' cross-mo-
tions for summary judgment on February

21, 1985. Plaintiffs were represented by Lester J. Marston and Henry J. Sockbeson. Defendants were represented by Pamela S. West and Louis A. Demas. Following oral argument, the court requested that the parties submit supplemental briefing by April 22, 1985. Having duly considered the respective positions of the parties as presented in their briefs and at oral argument, the court now renders its decision.

## I. BACKGROUND

Plaintiffs are an individual Native American, Wanda Carrillo, and three Native American tribes, Coyote Valley Band of Pomo Indians, Hopland Band of Pomo Indians, and Karuk Tribe of California. All three tribes are federally recognized tribal entities which have a government-to-government relationship with the United States and are eligible for programs administered by the Bureau of Indian Affairs ("BIA"). *See* Federal Register, Vol. 46, No. 130 (July 8, 1981).

On April 9, 1984, plaintiffs brought this action seeking declaratory and injunctive relief against the United States of America, the Secretary of the Interior, and various officials of the BIA. Plaintiffs allege that defendants acted arbitrarily, capriciously, and in direct violation of federal law and their trust responsibility to plaintiffs by (1) unreasonably delaying the calling of secretarial elections on their draft constitutions

under the Indian Reorganization Act of 1934 ("IRA"), 25 U.S.C. § 461 *et seq.;* (2) establishing an unwritten policy requiring BIA review and approval of IRA draft constitutions prior to authorizing elections; (3) failing to adopt uniform standards for reviewing and approving IRA constitutions; and (4) refusing to provide BIA benefits and services to plaintiffs until after the calling of IRA elections.

In their cross-motions for summary judgment, the parties present a question of first impression which requires the court to interpret provisions of the IRA as well as various regulations promulgated pursuant to that Act. At the heart of this controversy is the proper interpretation of 25 U.S.C. § 476 which authorizes any recognized Indian tribe to organize for its common welfare and to adopt an appropriate constitution by a majority vote of the adult members of the tribe.[1] Tribal ratification of a draft constitution in such a manner cannot be accomplished until the Secretary of the Interior authorizes a special election.

Plaintiffs challenge the Secretary's practice of withholding authorization of special elections until after the completion of a lengthy process for the review and modification of proposed tribal constitutions by the BIA. They contend that the Secretary has delayed authorization of elections for several years from the time of the tribes' initial request for elections because the

---

1. Title 25 U.S.C. § 476 provides:

   Any Indian tribe, or tribes, residing on the same reservation, shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws, which shall become effective when ratified by a majority vote of the adult members of the tribe, or of the adult Indians residing on such reservation, as the case may be, at a special election authorized and called by the Secretary of the Interior under such rules and regulations as he may prescribe. Such constitution and bylaws, when ratified as aforesaid and approved by the Secretary of the Interior, shall be revocable by an election open to the same voters and conducted in the same manner as hereinabove provided. Amendments to the constitution and bylaws may be ratified and approved by the Secretary in the same manner as the original constitution and bylaws.

   In addition to all powers vested in any Indian tribe or tribal council by existing law, the constitution adopted by said tribe shall also vest in such tribe or its tribal council the following rights and powers: To employ legal counsel, the choice of counsel and fixing of fees to be subject to the approval of the Secretary of the Interior; to prevent the sale, disposition, lease, or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe; and to negotiate with the Federal, State, and local Governments. The Secretary of the Interior shall advise such tribe or its tribal council of all appropriation estimates or Federal projects for the benefit of the tribe prior to the submission of such estimates to the Office of Management and Budget and the Congress.

tribes did not willingly incorporate the BIA's suggested modifications into their draft constitutions.[2]

Plaintiffs maintain that, in order to be consistent with the statutory policy in favor of tribal self-government, section 476 of the IRA must be interpreted to impose upon the Secretary a mandatory, nondiscretionary duty to authorize elections within a reasonable time after a final request from an eligible tribe. It is their view that, while defendants may offer recommendations for the modification of draft constitutional provisions prior to elections, the Secretary has the discretion to approve or disapprove the constitution only *after* an election has been held and the constitution officially ratified by the majority vote of tribal members. Plaintiffs therefore assert that the Secretary's failure to call elections at this stage of the process violates defendants' trust responsibility to them under 25 U.S.C. § 476 of the IRA, regulations promulgated thereunder, and 5 U.S.C. § 706(2)(A) of the Administrative Procedure Act ("APA"). They also assert that the BIA's failure to publish its existing procedure for the pre-election review and approval of draft constitutions violates 5 U.S.C. §§ 552 and 553 of the APA.[3]

Defendants take the position that the Secretary has broad, unreviewable discretion to approve the draft constitution in all particulars *before* he authorizes an election under section 476. In the alternative, if secretarial discretion is reviewable, defendants argue that the Secretary's decision to withhold elections was neither arbitrary nor capricious. They maintain that section 476 authorizes the Secretary only to conduct elections on "appropriate" constitutions, *i.e.*, those with provisions which conform with his interpretation of federal law. Elections, they argue, are too costly and should not be called unless the tribal constitution has received prior approval from the Secretary. Otherwise the election would be a meaningless formality because the Secretary would certainly disapprove the constitution after tribal members had ratified it.

## II. SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted when it is demonstrated that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Questions of statutory construction and legislative history present legal questions which are properly resolved by summary judgment. *State of Oklahoma ex rel. Dept. of Human Services v. Weinberger*, 741 F.2d 290, 291 (10th Cir.1983); *Int'l Ass'n of Machinists v. Texas Steel Co.*, 538 F.2d 1116, 1119 (5th Cir.1976), *cert. denied*, 429 U.S. 1095, 97 S.Ct. 1110, 51 L.Ed.2d 542 (1977); *Asuncion v. District Director, INS*, 427 F.2d 523, 524 (9th Cir.1970); *Schlothan v. Territory of Alaska*, 276 F.2d 806, 815 (9th Cir.), *cert. denied*, 362 U.S. 990, 80 S.Ct. 1079, 4 L.Ed.2d 1022 (1960).

The parties in this case filed a voluminous administrative record and numerous depositions, exhibits, and declarations to support their respective positions. These documents were offered to substantiate various factual allegations regarding, *inter*

---

**2.** The Coyote Valley Band of Pomo Indians submitted its draft IRA constitution to the BIA on February 22, 1980. *See* Administrative Record ("A.R."), C–16. They transmitted their first request for a secretarial election to the Central California Agency of the BIA on October 31, 1980. A.R., C–17. The Hopland Band of Pomo Indians initially requested approval of its proposed constitution on November 7, 1980. *See* Plaintiffs' Memorandum of Points and Authorities In Support of Summary Judgment, Appendix 4. The Karuk Tribe made its first request for a secretarial election on November 15, 1979. A.R., K–2. It made a subsequent request on

March 19, 1981 after modifying its draft constitution as recommended by the BIA. A.R., K–12.

**3.** Initially, plaintiffs also sought a preliminary injunction on the ground that defendants had allegedly threatened to terminate their BIA benefits and services in violation of the APA and their fifth amendment rights. The court decided to hold the motion for preliminary injunction in abeyance after receiving defendants' verbal assurances in open court that the BIA had not taken and would not take any action to terminate plaintiffs' benefits or services.

*alia,* plaintiffs' status as federally recognized Indian tribes, bands, or "entities," the composition of the tribes' governing bodies, the extent of plaintiffs' landholdings, the correspondence between the parties, the length of time involved in the review process, and the substance of the BIA's requested constitutional modifications.

The court emphasizes that it is confining its analysis to the narrow issue of whether the Secretary has a nondiscretionary duty to hold an IRA election within a reasonable time after a final request from an eligible tribe. This is a question of law, the resolution of which does not depend on an evaluation of the parties' factual allegations. The court does not purport to resolve, at this time, any disputed facts regarding the legitimacy of the plaintiff tribes' governing bodies, the nature and extent of tribal landholdings, or the legal validity of the specific constitutional modifications requested by

the BIA. Thus, this is an appropriate case for summary judgment.

## III. SUBJECT MATTER JURISDICTION

■ Plaintiffs allege several alternative bases of federal jurisdiction: the APA, 5 U.S.C. § 701 *et seq.,* and 28 U.S.C. §§ 1331, 1337, 1361, and 1362.[4]

Among the statutes cited by plaintiffs, only 5 U.S.C. § 702 of the APA provides for a specific waiver of the United States' sovereign immunity. *See McCartin v. Norton,* 674 F.2d 1317, 1321 (9th Cir.1982); *Beller v. Middendorf,* 632 F.2d 788, 796–97 (9th Cir.1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981). There is, however, no independent grant of federal jurisdiction under the APA. *Califano v. Sanders,* 430 U.S. 99, 104–08, 97 S.Ct. 980, 983–86, 51 L.Ed.2d 192 (1977); *McCartin,* 674 F.2d at 1319. Plaintiffs must therefore look to other statutes which do provide independent subject matter jurisdiction.[5]

---

4. Title 5 U.S.C. § 702:
   A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein denied on the ground that it is against the United States or that the United States is an indispensable party.
   Title 28 U.S.C. § 1331:
   The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.
   Title 28 U.S.C. § 1337:
   The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.
   Title 28 U.S.C. § 1361:
   The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.
   Title 28 U.S.C. § 1362:
   The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body

duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.

5. The APA requires exhaustion of administrative remedies prior to judicial review. 5 U.S.C. § 704; *Lloyd C. Lockrem, Inc. v. United States,* 609 F.2d 940, 942 (9th Cir.1979). In their briefs, defendants initially argued that plaintiffs had failed to obtain a final agency decision and to exhaust administrative remedies and that they were therefore foreclosed from seeking judicial review under the APA by 5 U.S.C. § 704 and the doctrine of ripeness. Defendants also contended that without the APA's specific waiver, plaintiffs' claims were barred by the doctrine of sovereign immunity.
   Plaintiffs responded that the Secretary's refusal to authorize elections upon tribal request constituted final agency action because no administrative remedy existed once plaintiffs refused to implement the recommended changes in their draft constitutions. *See, e.g., United Farm Workers v. Arizona Agricultural Employment Relations Board,* 669 F.2d 1249, 1253 (9th Cir.1982) ("Exhaustion of administrative remedies is not required where the remedies are inadequate, inefficacious, or futile...."). *See also Aleknagik Natives Ltd. v. Andrus,* 648 F.2d 496, 499–500 (9th Cir.1980), *citing Frontier Airlines v. Civil Aeronautics Board,* 621 F.2d 369, 371 (10th Cir.1980) ("The general rule requiring exhaustion of remedies before an administrative

The court finds that the statutes conferring federal jurisdiction in this area are 28 U.S.C. §§ 1331, 1361 and 1362. Since the success or failure of plaintiffs' claims depends on an interpretation of federal law, namely 25 U.S.C. § 476 and its accompanying regulations, federal question jurisdiction under section 1331 exists. *Gully v. First Nat'l Bank*, 299 U.S. 109, 112, 57 S.Ct. 96, 97, 81 L.Ed. 70 (1936); *cf. Boe v. Fort Belknap Indian Community*, 642 F.2d 276, 279 (9th Cir.1981). Insofar as plaintiffs allege that the Secretary owed them a mandatory duty under section 476 to call an election and assuming that no other adequate remedy is available, jurisdiction under the mandamus statute may also be appropriate. *See, e.g., Fallini v. Hodel*, 783 F.2d 1343, 1345 (9th Cir.1986); *Rockbridge v. Lincoln*, 449 F.2d 567, 573 (9th Cir.1971). Finally, since three plaintiffs are Indian tribes or bands with governing bodies recognized by the Secretary, they also qualify to bring suit under section 1362.[6] The scope of section 1362 has been construed to be as broad as that of section 1331. *Mescalero Apache Tribe v. Burgett Floral Co.*, 503 F.2d 336, 338 (10th Cir.1974). The facts alleged by plaintiffs do not suggest that the case arises under statutes regulating commerce or trade, and therefore, 28 U.S.C. § 1337 provides no basis for jurisdiction.

## IV. REVIEWABILITY OF THE SECRETARY'S DECISION

The APA, 5 U.S.C. § 701(a)(2), exempts from judicial review agency actions that are "committed to agency discretion by law." Defendants contend that the Secretary has unreviewable discretion to approve draft constitutions and to determine whether they contain provisions "appropriate" under federal law before authorizing elections.

■ As a general rule, administrative actions are subject to judicial review. Nonreviewability is the narrow exception which must be clearly demonstrated. *City of Santa Clara v. Andrus*, 572 F.2d 660, 666 (9th Cir.), *cert. denied*, 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978). The Ninth Circuit has cautioned that "[p]reclusion of judicial review is not lightly inferred, and usually will not be found absent a clear command of the statute." *Moapa Band of Paiute Indians v. United States Dept. of Interior*, 747 F.2d 563, 565 (9th Cir.1984).

Applying these principles to this case, the court finds defendants' actions subject to review. *See* 5 U.S.C. § 706(1) and (2)(A). Whether the Secretary has any discretion under section 476 to withhold elections once a tribe has requested an election on the final draft of its constitution is the precise question to be resolved by this court. To properly address the merits of plaintiffs' claims, the court must examine the statutory language, the legislative intent, and the regulations promulgated pursuant to the statute. Arguing that the Secretary has nonreviewable discretion merely begs the question and does not assist the court in its inquiry.

All the parties agree that section 476 of the IRA provides for discretionary secretarial approval of draft constitutions. Their present dispute focuses on whether that discretion may be exercised prior to, as well as after, the secretarial election. In order to resolve that dispute, the court certainly has the authority to interpret sec-

---

agency is subject to an exception where the question is solely one of statutory interpretation.")

At oral argument, defendants withdrew the ripeness argument on the grounds that John W. Fritz, Deputy Assistant Secretary of Indian Affairs, had issued a final decision in January 1985 stating that plaintiffs Coyote Valley and Hopland could have elections only if they modified their constitutions and that plaintiff Karuk could have no secretarial election until it took

action to validly constitute an interim governing body. Inasmuch as defendants have conceded that there is a final agency action within the meaning of the APA, the case is ripe for review and is not barred by the doctrine of sovereign immunity.

**6.** On November 5, 1985, defendants filed a supplemental declaration indicating that they recognize the interim tribal governments of all three tribal plaintiffs.

tion 476 of the IRA and its concomitant regulations. It is axiomatic that the interpretation of federal law is the province and duty of the judiciary. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803); *WNCN Listeners Guild v. F.C.C.,* 610 F.2d 838, 854–55 (D.C.Cir.1979), *rev'd on other grounds,* 450 U.S. 582, 101 S.Ct. 1266, 67 L.Ed.2d 521 (1981) ("[I]n matters of interpreting the 'law' the final say is constitutionally committed to the judiciary."). *See also Securities and Exchange Commission v. Sloan,* 436 U.S. 103, 118, 98 S.Ct. 1702, 1711, 56 L.Ed.2d 148 (1978), *citing F.T.C. v. Colgate-Palmolive Co.,* 380 U.S. 374, 385, 85 S.Ct. 1035, 1042, 13 L.Ed.2d 904 (1965).

## V. SECRETARY'S DUTY TO CALL ELECTIONS

■ The source of the Secretary's duty to call elections on IRA draft constitutions is 25 U.S.C. § 476. It provides in relevant part:

> Any Indian tribe, or tribes, residing on the same reservation, shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws, which shall become effective when ratified by a majority vote of the adult members of the tribe, or the adult Indians residing on such reservation, as the case may be, at a special election authorized and called by the Secretary of the Interior under such rules and regulations as he may prescribe. Such constitution and bylaws, when ratified as aforesaid and approved by the Secretary of the Interior, shall be revocable by an election open to the same voters and conducted in the same manner as hereinabove provided.

Since the court is interpreting a statute in a case of first impression, it must look to the traditional signposts of statutory construction: first, the language of the statute itself; second, its legislative history; and third, the interpretation given to it by its administering agency. *Brock v. Writers Guild of America, West, Inc.,* 762 F.2d 1349, 1353 (9th Cir.1985); *Brothers v. First*

*Leasing,* 724 F.2d 789, 792 (9th Cir.), *cert. denied,* 469 U.S. 832, 105 S.Ct. 121, 83 L.Ed.2d 63 (1984).

■ In light of the special trust relationship between the United States and Indian tribes, this court must also be mindful of well-established canons of statutory construction which have been developed to construe federal statutes affecting Indian affairs. *See generally* F. Cohen, *Handbook of Federal Indian Law,* 220–28 (1982 ed.). In *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980), the Supreme Court observed:

> The right of tribal self-government is ultimately dependent on and subject to the broad power of Congress. Even so, traditional notions of Indian self-government are so deeply engrained in our jurisprudence that they have provided an important "backdrop," ... against which vague or ambiguous federal enactments must always be measured.

Thus, the courts have consistently applied the principle that statutes passed for the benefit of Indian tribes and communities are to be liberally construed in favor of the Indians, and any doubt as to a statute's proper construction is to be resolved in their favor. *Bryan v. Itasca County,* 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976); *Ashcroft v. United States Dept. of Interior,* 679 F.2d 196, 198 (9th Cir.1982), *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1185, 75 L.Ed.2d 432 (1983); *Rockbridge,* 449 F.2d at 571.

### A. Statutory Language

Defendants contend that there are three clauses in 25 U.S.C. § 476 which suggest that the Secretary has broad discretion to approve a draft constitution *before* he calls elections. The court will examine each of these clauses in turn.

> *Clause (1):* "Any Indian tribe ... may adopt an appropriate constitution and bylaws which shall become effective when ratified...."

"Appropriate" is the word in clause (1) focused upon by defendants. They claim

that the Secretary must have discretion to determine what is "appropriate" because he cannot call a federal election on a document which "violates" federal law. Following this line of reasoning, defendants assert that a document which the Secretary deems violative of federal law is *a priori* "inappropriate."

The court is not persuaded that the word "appropriate" necessarily confers pre-election discretion upon the Secretary to approve draft constitutions. One of the primary objectives of the IRA was to "encourage Indians to revitalize their self-government" and to participate more directly in developing the laws which intimately affect their lives. *See, e.g., Fisher v. District Court,* 424 U.S. 382, 387, 96 S.Ct. 943, 946, 47 L.Ed.2d 106 (1976); *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 151–52, 93 S.Ct. 1267, 1271–72, 36 L.Ed.2d 114 (1973). Keeping in mind the underlying purpose of the IRA, as well as canons of statutory construction favoring the Indians, an equally plausible interpretation would be that the constitution must be a document "appropriate" to the needs of the tribe as determined by the tribal members themselves. Nothing in the statute suggests that the Secretary must determine the appropriateness of the tribe's governing document before the tribal members themselves have had an opportunity to review and ratify it.

> *Clause (2):* "[The constitution shall become effective when ratified] at a special election authorized and called by the Secretary of the Interior under such rules and regulations as he may prescribe."

As will be discussed in greater detail in the section on the Secretary's administrative regulations, *infra,* the court finds that clause (2) refers to the procedural steps which must be followed by defendants in calling and administering secretarial elections. *See* 25 C.F.R. § 81 *et seq.* There are no rules and regulations, however, mandating pre-election secretarial approval of the substantive provisions of the tribes' governing documents.

The cases cited by defendants in support of their interpretation of this portion of the statute are distinguishable in that they do not involve the Secretary's imposition of substantive modifications on the content of proposed constitutions, but rather, deal with the Secretary's conceded authority to promulgate procedural rules to regulate the conduct of elections or to disapprove *already* ratified documents or laws.

For example, in *Cheyenne River Sioux Tribe v. Andrus,* 566 F.2d 1085 (8th Cir. 1977), *cert. denied,* 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed.2d 111 (1978), the court dealt with the issue of whether the tribal or federal constitution governed the age limitation on the right to vote in an election to amend the tribal constitution. The court held that the Secretary's regulation, which defined the voting age as 18 years of age in conformity with the twenty-sixth amendment to the United States Constitution, superseded the 21–year old voter age requirement contained in the tribal constitution. *Id.* at 1089. The Eighth Circuit reasoned that secretarial elections are federal elections which must be conducted in conformity with federal laws governing elections. In *Cheyenne,* unlike here, the *contents* of the proposed amendments were not at issue. It would be an unwarranted extension of the Eighth Circuit's reasoning to say that the substantive provisions in the tribes' governing documents must also be in total conformity with the Secretary's interpretation of "federal law" before tribal members may even vote to ratify them.

In another case cited by defendants, *Moapa Band of Paiute Indians v. United States Dept. of Interior,* 747 F.2d 563 (9th Cir.1984), the Ninth Circuit considered the propriety of the Secretary's decision to rescind a tribal ordinance which permitted houses of prostitution on a Nevada reservation. The court held that the Secretary's action was neither arbitrary nor capricious in light of the federal policy discouraging prostitution and a provision in the tribal constitution authorizing the Secretary to rescind tribal ordinances for "any cause." *Id.* at 565–66. *Moapa Band* did not involve

federal elections and, unlike this case, the Secretary had not attempted to invalidate the ordinance before it had been voted into effect. Furthermore, the Moapa Band's tribal constitution specifically authorized the Secretary to rescind tribal ordinances for "any cause."

Finally, in *Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe*, 370 F.2d 529 (8th Cir.1967), plaintiffs brought suit to invalidate on procedural grounds a secretarial election which was held to amend the tribal constitution and to poll the tribal membership for its opinion regarding the disposition of certain tribal claim awards. Plaintiffs contended that their rights in tribal property were diluted as a result of the alleged invalid election. *Id.* at 532. The Eighth Circuit decided that there was no federal question jurisdiction to consider plaintiffs' claims because their claim of right to the tribal property did not arise under federal law but under rights of tribal membership. In addition, the court held that the Secretary's discretionary approval of the amendments to the tribal constitution was not subject to review.[7] Thus, in *Twin Cities Chippewa Tribal Council*, unlike the case at hand, the Secretary did not challenge the substantive provisions of the amendment itself and an election had already been authorized and held.

> Clause (3): "Such Constitution and by-laws, when ratified as aforesaid and approved by the Secretary of the Interior...."

Clause (3) is the only portion of the statute which makes any mention of secretarial approval. It is not entirely clear, however, that the clause requires secretarial approval of draft constitutions *prior* to authorization of elections.

The starting point in any problem of statutory interpretation is the language of the statute itself and, absent a clearly expressed legislative intention to the contrary, that language is ordinarily conclu-

sive. *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Moorhead v. U.S.*, 774 F.2d 936, 941 (9th Cir.1985); *Tulalip Tribes of Washington v. F.E.R.C.*, 732 F.2d 1451, 1455 (9th Cir. 1984), *cert. denied,* — U.S. —, 106 S.Ct. 270, 88 L.Ed.2d 225 (1985). Here, the language "when ratified as aforesaid" precedes "and approved by the Secretary of the Interior." "[A]s aforesaid" refers back to the statutory description of when a constitution and bylaws become effective. By the terms of section 476, a constitution becomes effective when ratified by a majority vote of adult tribal members at a special election authorized by the Secretary pursuant to prescribed procedures. If Congress had intended that the Secretary should exercise his discretion to approve or disapprove draft constitutions prior to ratification, it could very easily have juxtaposed the order of the words to read "when approved by the Secretary of the Interior and ratified as aforesaid...." Given the existing language of the statute, however, the court can only conclude that ratification procedures precede secretarial approval and that no element of secretarial discretion exists at the pre-election stage.

Finally, the court must take note of the rule of statutory construction which commands it to avoid construing statutes in a manner which would lead to unjust or absurd consequences. *See, e.g., Pacific Mutual Life Ins. Co. v. American Guaranty Life Ins. Co.*, 722 F.2d 1498, 1500 (9th Cir.1984); *Church of Scientology v. U.S. Dept. of Justice*, 612 F.2d 417, 427 (8th Cir.1979). Defendants are concerned that if the Secretary is not allowed to have discretionary authority over draft constitutions prior to the calling of elections, tribes organizing under the IRA will request elections on constitutions which contain objectionable provisions and which are certain to be disapproved by the Secretary after ratification. Defendants maintain that be-

---

**7.** Without actually deciding the issue, this court construes the Eighth Circuit's holding regarding nonreviewability to mean that the Secretary's

*post-election* exercise of discretion to approve constitutional amendments is not subject to judicial review.

cause of the costliness of elections, it makes more sense to conduct elections only on those constitutions which have received prior approval.

Defendants' concerns are overstated. It is unlikely that a tribe would go to the trouble of requesting a secretarial election on a constitution which it knows is destined for disapproval—unless it *firmly* believes that the provisions found objectionable by the Secretary are valid and lawful. Perhaps a more constructive way for defendants to address any potential problems with hasty or impulsive election requests by tribal leaders would be to set up a more definitive timetable for the BIA's review of draft constitutions. While the divergent needs of various tribes may make it difficult to adopt iron-clad uniform rules regarding the substantive language of constitutions, there is an obvious need for *some* guidelines, whether in the form of regulations or an informal handbook, which set forth a general framework for the constitutional review procedure and a reasonable time period within which the review process is to be completed.

The review process would allow the BIA to provide needed drafting assistance and to suggest possible modifications to objectionable constitutional provisions. Once a tribe goes through this review process and makes a final request for an election, however, it will presumably have a document which *it* considers appropriate for the Secretary's approval. If the Secretary has expressed specific objections to certain constitutional provisions during the review period and the tribe nevertheless refuses to adopt the suggested modifications, the fight for approval will be carried on after the election, over a document which has been ratified by the tribe.

Under the current challenged procedure, defendants can delay the tribal reorganization process *indefinitely* simply by holding the draft constitution hostage and requiring modifications to be made prior to re-

leasing it for elections. Such an approach may operate to stultify the initiative shown by tribal leaders in moving toward reorganization and to discourage all of those who have inevitably expended much time and effort in the preparation of the tribe's governing document. It would be an understatement to say that defendants' current procedure is antithetical both to the spirit of the IRA and to traditional notions of meaningful self-government. Thus, it is defendants' interpretation of the statute which would lead to "unjust or absurd" consequences.

The court turns next to the legislative history of the IRA to determine whether it contradicts the court's interpretation of the statute.

## B.  Legislative History

A careful review of the legislative history of the IRA indicates that the issue of whether the Secretary has a mandatory, as opposed to a discretionary, duty to call elections was never specifically addressed. Nevertheless, an examination of the legislative materials reveals nothing contrary to this court's interpretation of the statute.

At its inception, the IRA was known as the Wheeler-Howard Bill.[8] It was entitled "[a] bill to grant to Indians living under Federal tutelage the freedom to organize for purposes of local self-government and economic enterprise...." H.R. 7902, 73rd Cong., 2d Sess. (1934) and S. 2755, 73rd Cong., 2d Sess. (1934). "[B]roadly, the measure proposes to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism." H.R.Rep. No. 1804, 73rd Cong., 2d Sess. 6 (1934).

The IRA reflects an ambivalent and sometimes precarious balance of federal guardianship principles with ideals of cultural, economic, and political self-determination. While the IRA did not contemplate

8.  *See generally* Comment, *Tribal Self-Government and the Indian Reorganization Act of 1934,* 70 Mich.L.Rev. 955, 961 (1972); F. Cohen, *Handbook of Federal Indian Law* (1982 ed.), at 147–51.

a complete cessation of secretarial supervision over various aspects of Indian life, one of the major objectives of the legislation was to curb administrative absolutism. *The Purpose and Operation of the Wheeler-Howard Indian Rights Bill (S. 2755; H.R. 7902):* Hearings on H.R. 7902 Before the House Committee on Indian Affairs, 73rd Cong., 2d Sess. 20 (1934). In a memorandum of explanation submitted to members of the Senate and House Committees on Indian Affairs, John Collier, former Commissioner of Indian Affairs, stated:

> The first section of the bill states the fundamental purpose of the bill, i.e., to promote Indian self-government, gradually to turn over to organized Indian communities the various functions and powers of supervision which the Interior Department now exercises, and to offer to Indians the opportunities of training and financial assistance which will be needed to carry out this program. It will be seen that the bill looks toward the elimination of the Office of Indian Affairs in its present capacity as a nonrepresentative governing authority over the lives and property of Indians. It contemplates that the Office of Indian Affairs will ultimately exist as a purely advisory and special service body, offering the same type of service to the Indians of the Nation that the Department of Agriculture offers to American farmers. But the proposed bill does not attempt a prediction with regard to the exact period needed for this transition. It sets up an empirical process, beginning with the chartering of an Indian community, and continuing with further grants and transfers of political authority and economic freedom; the velocity of this process will inevitably depend upon the desires and capacities of the Indians.

*Id.* at 22.

This court's interpretation of section 476 is consistent with the spirit of the IRA. The BIA may provide advice and guidance to aid a tribe in drafting its constitution, but the constitution is subject to secretarial approval only after the tribe has had an opportunity to ratify it. There is no direct evidence in the legislative history to indicate that Congress intended that the Secretary use elections as a *quid pro quo* for concessions on the substantive provisions of the tribe's governing document.

### C. The Secretary's Administrative Regulations

The interpretation given a statute by the agency charged with its administration is entitled to great deference. *Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1971); *Dep't of Educ., State of Hawaii v. Bell,* 770 F.2d 1409, 1413 (9th Cir.1985); *Kunaknana v. Clark,* 742 F.2d 1145, 1150 (9th Cir.1984). Furthermore, the agency's interpretation of an administrative regulation is controlling unless "plainly erroneous or inconsistent with the regulation." *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977); *Ashcroft,* 679 F.2d at 198. Pursuant to the authority delegated to him by 25 U.S.C. § 476, the Secretary has promulgated regulations prescribing the manner in which IRA elections will be called and conducted. *See* 25 C.F.R. § 81.1 *et seq.* The court finds that defendants' argument regarding the existence of pre-election secretarial discretion is belied by the Secretary's own administrative regulations.

For example, 25 C.F.R. § 81.4 provides that BIA officials "will cooperate with and offer advice and assistance (including the proposing of amendments), to any tribe in drafting a constitution." The BIA's ability to offer "advice" at the drafting stage does not translate into a power to withhold elections on the proposed constitution once a tribe has decided that it is not within its interest to adopt the BIA's suggested modifications.

The regulation governing requests to call elections is 25 C.F.R. § 81.5(a), the meaning of which can hardly be disputed:

> The Secretary *shall* authorize the calling of an election to adopt a constitution and bylaws or to revoke a constitution and

bylaws, *upon a request from the tribal government.*

(Emphasis added.) Section 81.5(a)'s use of the word "shall" imposes a nondiscretionary duty on the Secretary to call elections and comports with this court's interpretation of the language in 25 U.S.C. § 476. To further bolster plaintiffs' contention that ratification precedes the exercise of secretarial discretion, 25 C.F.R. § 81.24(a) provides:

> Action to approve or disapprove constitutional actions will be taken promptly by the authorizing officer *following receipt of the original text of the material voted upon* and the original of the Certificate of Results of Election from the officer in charge.

(Emphasis added.)

In addition, the court notes with interest that as early as 1947, in a pamphlet issued by the federal government, Theodore H. Haas, Chief Counsel for the United States Indian Service, provided a detailed description of the process by which a tribe could organize for self-government under the IRA:

> When a tribe is ready to draft its constitution, a constitutional committee of representative tribal members is chosen. It is the duty of this committee to draw up a constitution which will fit the needs of the tribe. The Department offers its assistance in the preparation of such documents, but only to the extent that such assistance is required. Scrupulous care is exercised to see that the document as drafted represents the wishes of the Indians.
>
> When the constitutional committee has completed its draft and is ready to present the constitution to the tribal members for a vote, an election is requested by the constitutional committee or by a petition signed by one-third of the adult members of the tribe. The calling of this election is mandatory upon the Secretary of the Interior when the request is made in the manner prescribed by law. Thus a tribe may vote repeatedly upon the question of adopting a constitution, in those cases where such elections have failed to carry. *It is not within the Secretary's discretion to determine whether or not the election shall be called.*

T.H. Haas, United States Indian Service, *Ten Years of Tribal Government Under I.R.A.*, p. 2 (1947) (emphasis added). Thus, just 13 years after the passage of the IRA, the agency charged with its administration made it clear that the Secretary's duty to call elections is a mandatory one.

## VI. CONCLUSION

The court finds that defendants' failure to call elections within a reasonable time after plaintiffs' final requests for elections is unlawful under 5 U.S.C. § 706(2)(A) of the APA. Defendants' conduct contravenes the procedures described in 25 U.S.C. § 476 and the accompanying administrative regulation, 25 C.F.R. § 81.5(a). The language of section 476, the policies underlying the statute, and defendants' own administrative regulations all support the conclusion that the Secretary has a mandatory duty to call elections upon a request from an eligible tribe.[9]

Since the court has decided that defendants' current practice of requiring secretarial approval of draft constitutions prior to elections is contrary to law, it is not necessary to address plaintiffs' additional contention that defendants violated the APA by failing to publish that invalid procedure.

In light of the foregoing, IT IS ORDERED:

1. That plaintiffs' motion for summary judgment is GRANTED; and

---

9. The court's ruling is declaratory in nature. The court declines to issue a permanent injunction at this time, since the prerequisites for injunctive relief were not specifically addressed in the parties' cross-motions for summary judgment. *See, e.g., Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506–07, 79 S.Ct. 948, 954–55,

3 L.Ed.2d 988 (1959). The court notes that the prevailing parties may obtain supplemental relief, if necessary, under 28 U.S.C. § 2202. *See, e.g., Doe v. Gallinot,* 657 F.2d 1017, 1025 (9th Cir.1981) (awarding supplemental injunctive relief).

2. That defendants' motion for summary judgment is DENIED.